I respectfully dissent. The majority opinion is convincingly written based on findings that: (1) plaintiff needed to find another doctor because he could not see the authorized doctor, Dr. Rhyne, and (2) defendants did not present evidence to show that plaintiff was employable. These suggestions were contained in plaintiff's brief and/or in oral argument to the Full Commission. The record, however, does not support these and other findings by the majority.
The essential question presented is whether the Commission will decide issues of suitability of employment and continuing disability based on objective results of a functional capacity evaluation (FCE) or the subjective beliefs of physicians who were without the benefit of the FCE results (and whose opinions were not relevant to the issues in any event). Absent reason to question an FCE, it should be accepted as the test and measure of physical capacity following injury. This is particularly true in the instant case because there is no evidence that the UPS/shipping job was not within plaintiff's abilities. The competent evidence requires a finding and conclusion that the employment was suitable and that plaintiff is not entitled to continuing indemnity benefits.
(1) "Plaintiff could not see Dr. Rhyne"
As background, plaintiff's claim is based on a motor vehicle incident on April 2, 1998. Although multiple injuries were noted from the accident, during the period of relevant inquiry, the complaints centered on the lumbar spine and lower extremity. Plaintiff was treated by his family doctor, who referred plaintiff to John de Perczel, M.D. A lumbar MRI was performed on April 23, 1998, revealing mild desiccation at L4-5 and L5-S1 with mild disc bulges. No evidence of disc herniation, spinal stenosis, or other cause for radicular symptoms were noted from this examination. Plaintiff also had a myelogram and enhanced CT scan in February 1999, which was reported by Dr. Miller as showing a disk bulge at L4-5 with minimal laterization to the left. Dr. de Perczel released plaintiff to return to work with restrictions. After Dr. de Perczel released plaintiff to work, plaintiff saw Dr. Rhyne, initially for a second opinion as to his work status and subsequently for treatment.
Plaintiff was seen by Alfred Rhyne, M.D., a Board Certified Orthopaedic Surgeon, on April 5, 1999, for a second opinion concerning plaintiff's condition and his ability to work. Dr. Rhyne diagnosed a strain to the lumbar spine with questionable sciatica. Although Dr. Rhyne was authorized initially as a second opinion doctor, he offered to treat plaintiff and plaintiff accepted his treatment plan and continued to see him. Dr. Rhyne recommended two weeks of work conditioning to be followed by an FCE and anticipated a return to work consistent with the FCE examination. Pending the first FCE, consistent with Dr. de Perczel's release, Dr. Rhyne opined that plaintiff would be able to work light duty and released him to work with no lifting over 25 pounds and with a sit/stand option.
On July 26, 1999, Dr. Rhyne summarized with plaintiff the results of the first FCE. Dr. Rhyne noted that the first FCE was not valid and presented questions of malingering. Dr. Rhyne advised plaintiff to use his best effort and scheduled a second FCE. On August 9, 1999, Dr. Rhyne summarized the results of the second FCE, which found that plaintiff could work in the medium to heavy work level with lifting of 75 pounds occasionally, 35 pounds on a frequent basis, and 15 pounds on a constant basis. Dr. Rhyne found plaintiff to be at maximum medical improvement with a 2% impairment rating. Dr. Rhyne saw plaintiff again on September 20, 1999, and noted that plaintiff was working 40 hours per week, that the examination had not changed, and that plaintiff was able to tolerate his pain level. Plaintiff was advised to exercise and ambulate, and was given a prescription for Anthrotec, an anti-inflammatory medication. Dr. Rhyne's chart note indicates that, if there is a flare up or an increase in symptoms, that he and plaintiff would proceed from there.
The majority finds that plaintiff had to see Dr. Miller because plaintiff was not able to see Dr. Rhyne. Although plaintiff and his wife testified that they called Dr. Rhyne's office nine or ten times prior to September 20, 1999, their testimony is not supported by the record. First, plaintiff did not have a scheduled appointment after his release to work on August 9, 1999, and therefore, plaintiff had to call and schedule the appointment with Dr. Rhyne for the September 20, 1999, appointment. And, obviously plaintiff was successful because he was examined by Dr. Rhyne on September 20, 1999. Second, Dr. Rhyne and his office have no records of telephone calls from plaintiff to schedule an appointment or to request prescriptions. Dr. Rhyne indicated that he or one of his partners would have seen plaintiff in their normal schedule or would have sent plaintiff to their after-hours or weekend clinic if he had made a request for an examination.
Although Finding of Facts 7, 8, and 10 suggest that plaintiff could not get in to see Dr. Rhyne and that he, therefore, sought Dr. Miller, the testimony of plaintiff and his wife do not support these conclusions. First, plaintiff testified that he wanted to see Dr. Miller at the suggestion of his attorney and because plaintiff thought something was wrong with his back other than what he was hearing from Dr. Rhyne. Second, plaintiff's wife testified that they had already made the appointment with Dr. Miller before plaintiff saw Dr. Rhyne on September 20, 1999. Thus, the evidence shows that plaintiff wanted to see Dr. Miller for a third opinion, rather than that Dr. Rhyne was refusing to provide treatment.
Plaintiff saw Dr. Miller on September 23, 1999, and presented with a normal neurological examination. Dr. Miller is a neurosurgeon who is not board certified as a specialist in his field. Based on his initial examination, Dr. Miller, believed that plaintiff's complaints of pain could be related to his degenerative discs and sought to have this evaluated with a discogram. When the discogram was negative, Dr. Miller referred plaintiff to Thomas Herfurth, an anesthesiologist specializing in pain management. Dr. Miller took plaintiff off from work pending the discogram and his appointment with Dr. Herfurth. Dr. Miller was not provided with the medical records of Dr. Rhyne's care and in particular was not aware of the FCE results. Furthermore, his subjective precaution, as a new examiner, in removing plaintiff from work does not contradict the objective findings of the FCE and Dr. Rhyne's release based on the FCE results.
Dr. Herfurth treated plaintiff for complaints of low back and hip pain from December 15, 1999, through at least August 17, 2000. Dr. Herfurth testified that he has not taken plaintiff out of work.
Thus, there is no competent evidence that plaintiff was unable to see Dr. Rhyne in a timely fashion. To the contrary, the evidence is clear that plaintiff was not pleased with his release to work in the UPS/shipping job[1] and sought to see Dr. Miller at the suggestion of his attorney. Dr. Rhyne saw plaintiff on September 20, 1999, and there is no evidence that he refused or would refuse to continue treating plaintiff. To the contrary, Dr. Rhyne's last chart note indicates that he would re-evaluate plaintiff's treatment plan should plaintiff's symptoms or condition change, which hardly suggests an abandonment of the patient or a refusal to see him. Although plaintiff and his wife testified that they called Dr. Rhyne's office nine or ten times to get an appointment, there is no evidence that the failure to receive care was caused by defendants. Plaintiff suggests that they had trouble getting approval from the insurance company, but plaintiff's suggestion is not supported in the record. The record contains a fax coversheet and a letter dated September 16, 1999, from plaintiff's attorney to the insurance adjuster stating that Dr. Rhyne's office refuses to make an appointment for plaintiff. This evidence, however, does not support the finding that defendants were refusing to provide medical care. First, plaintiff saw Dr. Rhyne four days after the fax. Second, although the third page of the fax to the adjuster appears to be the fax confirmation page, the phone number on the confirmation sheet does not match the fax number for the fax coversheet. Thus, the evidence is either that defendants timely and appropriately responded, or that they did not get the message. The evidence does not support the finding that the defendants have lost their right to direct medical care by denying treatment with Dr. Rhyne.
(2) "Defendants presented no evidence that plaintiff was employable"
The most disturbing finding is that defendants failed to present any evidence that plaintiff was employable. But what about the FCE? An FCE is an objective measure of the patient's physical capabilities to perform the various physical functions of employment. An FCE is intended to assist the health care provider in determining the safe level of activities that a patient may perform in employment. FCE results are routinely used by the Commission for this very purpose. Thus there is no basis for a finding that defendants presented "no evidence" of employability.
In this case, the evidence is that plaintiff had two functional capacity examinations. The first found that plaintiff could perform in the light duty range, but the test was invalid because plaintiff did not cooperate fully. Dr. Rhyne sent plaintiff to another facility for another FCE with the admonition that plaintiff needed to give his best effort. The results of the second FCE were accepted as valid and showed that plaintiff could work in the medium to heavy category with lifting restrictions of 15 pounds constantly, 35 pounds frequently, and 75 pounds occasionally. Dr. Rhyne released plaintiff to work within these restrictions and the only evidence on this issue is that the UPS/Shipping job offered to plaintiff and performed by plaintiff was within the restrictions established by the FCE and permitted by Dr. Rhyne. Further, Dr. Rhyne observed plaintiff on September 20, 1999, after plaintiff had returned to work in the UPS/shipping position, and reported that plaintiff's condition had not changed and that he was able to tolerate the pain and discomfort. Dr. Rhyne did not take plaintiff off the UPS/Shipping job.
The majority appears to rely on evidence that Dr. Miller (the non-Board certified physician to whom plaintiff was referred by his attorney) took plaintiff off from work pending a discogram and referral to pain management as relevant evidence on the plaintiff's employability. This fact, however, is not competent, relevant, or material to this issue and does not contradict the objective findings of the FCE or Dr. Rhyne's release to return to work based on the FCE.
On the face of it, there might appear to be a conflict between Dr. Rhyne returning plaintiff to work and Dr. Miller taking plaintiff out of work. In fact, however, Dr. Miller's action in taking plaintiff off from work cannot and should not be read as evidence contrary to the FCE and Dr. Rhyne's return to work release. Dr. Miller was not provided with Dr. Rhyne's medical records and, in particular, was not provided with the FCE. There is no evidence in the record that Dr. Miller disagreed with or otherwise did not accept the FCE. The only evidence is that Dr. Miller was not aware that plaintiff had an FCE and that he prophylactically took plaintiff out of work pending a discogram to determine whether plaintiff had an operable condition. The discogram was negative, and Dr. Miller stopped treating plaintiff and referred him to pain management because he had nothing to offer — plaintiff did not have a surgical condition as Dr. Miller first opined.
Removing plaintiff from work pending the discogram may be viewed as prudent, conservative care and may justify plaintiff's absence from work during that specific time period. Such evidence, however, does not negate the FCE and is not relevant to the issue of plaintiff's employability: the discogram was negative and did not reveal the more serious abnormality that Dr. Miller initially suspected; Dr. Miller's suspicion that plaintiff had a spinal abnormality, which suspicion was ruled out, cannot and does not tend to prove that plaintiff could not perform the functions and job duties revealed in the FCE. In other words, Dr. Miller's disproved suspicion does not challenge the validity of the FCE or Dr. Rhyne's opinion and thereby cannot be considered legally competent evidence or evidence relevant to the issue of plaintiff's employability.
Similarly, the medical information from Dr. Herfurth and the pain management program does not contradict the FCE or the return to work release from Dr. Rhyne. When plaintiff went to the pain management program with Dr. Herfurth, he was not taken off from work. Dr. Herfurth testified that he never took plaintiff out of work. There is no evidence in plaintiff's medical records or Dr. Herfurth's deposition which attempts to contradict the FCE and the return to work by Dr. Rhyne based on the FCE.
It may bear noting that plaintiff does not benefit from a presumption of continuing disability in this case. See Sims v. Charmes/Arby's RoastBeef, 142 N.C. App. 154, 542 S.E.2d 277, disc. rev. den., 550 S.E.2d 782
(N.C. 2001).
In my opinion, there is no legally competent, relevant, or material evidence showing that plaintiff was not employable and is entitled to continuing disability benefits. See Young v. Hickory BusinessFurniture, 353 N.C. 227, 538 S.E.2d 912 (2000) (speculation and conjecture is not evidence); Smith v. Beasley Enterprises, ___ N.C. App. ___, ___ S.E.2d ___ (February 5, 2002) (medical expert's testimony must be sufficiently reliable to be competent evidence); Seealso Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579,113 S.Ct. 2786 (1993) (court has duty to police the evidence to ensure that it is scientifically credible). The only relevant and competent evidence is the FCE and Dr. Rhyne's return to work release,[Note 2] which compel findings to the contrary. The issue is not whether there is conflicting evidence which the majority weighs in favor of plaintiff. Rather, the majority ignores competent evidence and makes findings that are not supported by the evidence. In an appeal from the Industrial Commission, the appellate courts may review the two questions of law presented in this case, "namely (1) [w]hether or not there was any competent evidence before the Commission to support its findings of fact, and (2) whether or not the findings of the Commission justify its legal conclusions and decisions." Inscoe v. DeRose Industries,292 N.C. 210, 232 S.E.2d 449
(1977); Stevenson v. Noel Williams Masonry, 2001 WL 1657309, ___ N.C. App. ___, ___ S.E.2d ___ (2001); Loch v. Entertainment Partners, 2001 WL 1657324, ___ N.C. App. ___, ___S.E.2d ___ (2001); Janney v. J.W. JonesLumber Co., ___ N.C. App. ___, 550 S.E.2d 543 (2001). The findings of the Commission are conclusive only when they are supported by competent evidence. See Janney, supra. The Commission has the duty to determine whether proffered evidence is competent and must weigh all of the competent evidence in rendering its decision. See Young v. HickoryBusiness Furniture, supra (speculation and conjecture is not evidence);Smith v. Beasley Enterprises, ___ N.C. App. ___, ___ S.E.2d ___ (February 5, 2002) (Commission needs to determine competent evidence and weigh the competent evidence); See also Daubert v. Merrell Dow Pharmaceuticals,Inc., supra (court has duty to police the evidence to ensure that it is scientifically credible).
Dr. Miller and Dr. Herfurth was not aware of the FCE and its results, were not aware that Dr. Rhyne had released plaintiff to return to work based on the FCE, and were not aware that Dr. Rhyne had examined plaintiff after he had returned to work for more than a month and further that Dr. Rhyme believed that plaintiff could continue in this employment. The lack of this relevant evidence by Dr. Miller and Dr. Herfurth renders their opinions concerning plaintiff's employability to be less than competent evidence. See Smith v. Beasley Enterprises, ___ N.C. App. ___, ___ S.E.2d ___ (February 5, 2002) (lack of knowledge of pertinent information affects competency of physician's opinion).
Further, the majority has ignored the competent evidence from Dr. Rhyne and the results of the FCE. The Commission may not disregard and ignore competent evidence. Smith v. Beasley Enterprises, ___ N.C. App. ___, ___ S.E.2d ___ (February 5, 2002); Jenkins v. Easco Aluminum Corp.,142 N.C. App. 71, 541 S.E.2d 510 (2001); Lineback v. Wake County Board ofCommissioners, 126 N.C. App. 678, 486 S.E.2d 252 (1997). Although the full Commission is generally the final arbiter of credibility, the Commission cannot ignore or refuse to consider competent evidence.Harrell v. J.P. Stevens Co., 45 N.C. App. 197, 262 S.E.2d 830, rev.denied, 300 N.C. 196, 269 S.E.2d 623 (1980). The appellate courts have explained the duty of the full Commission:
 "It is the duty of the Commission to consider all of the competent evidence, make definitive findings, draw its conclusions of law from these findings, and enter the appropriate award. In making its findings, the Commission's function is "to weigh and evaluate the entire evidence and determine as best it can where the truth lies." West v. J. P. Stevens, 6 N.C. App. 152, 156, 169 S.E.2d 517, 519 (1969). (Emphasis added.) To weigh the evidence is not to "discount" it. To weigh the evidence means to ponder it carefully; it connotes consideration and evaluation; it involves a mental balancing process. To "discount" the evidence, on the other hand, is to disregard it, to treat it as though it had never existed, to omit it from consideration. While the Commission is the sole judge of the credibility of witnesses and may believe all or a part or none of any witness's testimony, Morgan v. Thomasville Furniture Industries, Inc., 2 N.C. App. 126, 162 S.E.2d 619
(1968), it nevertheless may not wholly disregard competent evidence. Contradictions in the testimony go to its weight, and the Commission may properly refuse to believe particular evidence."
Id. The majority in this case has accepted the plaintiff's testimony in all regards and the evidence from Dr. Miller and Dr. Herfurth, despite the fact that they have not explained why the FCE is not reliable and why the plaintiff could not work within the restrictions of the FCE, and the majority ignores, as if it did not exist, the testimony of Dr. Rhyne and the objective results of the FCE which shows that plaintiff could work in the medium to heavy work levels. The majority has erred in this case in failing to consider and evaluate competent evidence which conflicts with its opinion. Jenkins v. Easco Aluminum Corp., 142 N.C. App. 71,541 S.E.2d 510 (2001); Harrell v. J.P. Stevens Co., supra.
Rather than reviewing all the competent evidence in this case, the majority has stopped upon finding, in their view, that plaintiff has established a prima facie case; the majority ignores all conflicting evidence. This is consistent with the "viewed in the light most favorable to plaintiff" and "plaintiff is entitled to the benefit of every reasonable inference to be drawn from the evidence" standard of review that is only applicable to appellate review of Commission decisions. This position, however, totally ignores the duty of the Full Commission to determine whether evidence is competent and then to weigh all the competent evidence before drawing conclusions. See Cauble v. TheMache Co., 78 N.C. App. 793, 338 S.E.2d 320 (1986); Wagoner v. DoublasBattery Mfg. Co., 80 N.C. App. 163, 341 S.E.2d 120 (1986); Rooks v. IdealCement Co., 9 N.C. App. 57, 175 S.E.2d 324 (1970). The Full Commission is not an appellate body and does not apply the "some evidence" standard of review. See Adams v. AVX Corp., 349 N.C. 676,509 S.E.2d 411 (1998); Cauble supra; Wagoner, supra;Rooks, supra. Rather the Full Commission has the duty to review objectively all the competent evidence:
 "The plenary powers of the Commission are such that upon review, it may adopt, modify or reject the findings of fact of the Hearing Commissioner, and in doing so may weigh the evidence and make its own determination as to the weight and credibility of the evidence. [citation omitted] The Industrial Commission has the duty and authority to resolve conflicts in the testimony whether medical or not, and the conflict should not always be resolved in favor of the claimant."
Wagoner, supra.
For the foregoing reasons, I respectfully dissent.
Signed this ___ day of April, 2002.
 S/_____________________________ RENEE C. RIGGSBEE COMMISSIONER
RCR/gas
[1] NOTES
1. The record suggests that plaintiff may not have desired the UPS/Shipping position because his wife held that position. Plaintiff wanted to work as a truck driver for short routes.
2. The fact that Dr. Miller took conservative measures and wrote slips to take plaintiff out of work temporarily is relevant and material to the issue of whether plaintiff should have reported to work during the period covered by the remain off from work slips. This evidence, however, is not competent, relevant, or material to the issue of whether plaintiff was employable and is not evidence that contradicts the FCE results. Setting aside the fact that Dr. Miller was not authorized and should not be authorized under the theory that plaintiff was unable to see Dr. Rhyne, Dr. Miller's temporary release from work pending further medical testing may be some evidence that plaintiff (if he brought the remain off from work slips to his employer) would be entitled to refrain from work during the period provided under the release(s). The evidence, however, is that plaintiff did not respond to his employer's inquiry as to who was Dr. Miller and why was plaintiff not at work; plaintiff did not provide subsequent out of work slips; and plaintiff failed to provide his employer with an excuse for not reporting to work.